# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| EMILY J. BAHR, | ) | CASE NO.  5:13CV1057 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | OPINION AND ORDER |
| | ) | |
| | ) | |
| TECHNICAL CONSUMER | ) | |
| PRODUCTS, INC., | ) | |
| | ) | |
| DEFENDANT. | ) | |

Plaintiff Emily Bahr ("plaintiff" or "Bahr") commenced the present action in the Portage County Common Pleas Court on April 5, 2013, alleging that defendant Technical Consumer Products, Inc. ("defendant" or "TCP") failed to pay her a bonus she earned during her employment as a salesperson with TCP.  Plaintiff's complaint raised numerous state law claims, including a claim under a Minnesota statute that permits the recovery of double damages and attorney's fees. *See* Minn. Stat. §§ 181 *et seq*. Plaintiff also brought a claim under the Ohio Prompt Pay Act, Ohio Rev. Code § 4113.15, a statute that does not provide for double damages or attorney's fees.

On May 9, 2013, TCP removed the action to this Court, citing diversity jurisdiction as Bahr is a resident of Minnesota and TCP is a Delaware corporation with its principal place of business in Aurora, Ohio. (Doc. No. 1-2, Compl. at ¶¶ 1-2.) *See* 28 U.S.C. § 1332(a). During the Case Management Conference on July 8, 2013, the Court *sua sponte* raised the issue of its jurisdiction to hear this matter, and directed the parties

to brief the issue. (Doc. Nos. 21 and 24, plaintiff's initial brief and response brief, respectively; Doc. Nos. 20 and 26, defendant's initial brief and response brief, respectively.) The parties agree that if Minnesota law does not apply to the contract claims, diversity jurisdiction is lacking because the alleged unpaid bonus amount of $51,716 would not exceed the $75,000 amount in controversy threshold. The Court must, therefore, determine whether Minnesota or Ohio law applies to the contract claims.

## I.  BACKGROUND

The facts relevant to the present choice of law issue are not in dispute, though their legal significance is hotly contested. In 2010, plaintiff responded to a job advertisement placed by TCP on an on-line employment website. The advertisement did not indicate that the employer was located in Ohio. Following a favorable screening call placed by Christine Reda, Human Resources Manager, from TCP's Ohio headquarters to plaintiff in Minnesota, an interview was scheduled in Minnesota. Matt Fejedelem, Regional Sales Manager for TCP, and Mike Masino, Senior Vice President of Sales, traveled from their respective offices in Ohio and Wisconsin to meet with plaintiff in Minneapolis, Minnesota. A second interview between Fejedelem and plaintiff took place in Bloomington, Minnesota. (Doc. No. 21-1, Decl. of Emily Bahr at ¶ 2; Doc. No. 18, Joint Stipulations at ¶¶ 3, 5.)

At the conclusion of the interview process, TCP extended plaintiff an offer of employment as a district sales manager for the territory consisting of Minnesota, North Dakota, and South Dakota.  (Joint Stip. at ¶¶ 2, 12.) The offer was initially communicated to plaintiff by a call placed from TCP's Ohio headquarters to plaintiff in Minnesota. The offer was memorialized in a June 9, 2010 letter from Reda to plaintiff that was sent via

2

mail by TCP to plaintiff's residence in Minnesota. (Bahr Decl. at ¶ 3.) The offer letter addressed plaintiff's base salary and benefits, but did not discuss the availability of a bonus. The letter also did not address what state's law would apply to issues relating to plaintiff's employment with TCP. (Doc. No. 1-2, Offer Letter at 25.) Plaintiff accepted the offer by directing an email from her home to TCP's Director of Human Resources at TCP's main campus in Ohio. (Doc. No. 25, Supplemental Decl. of Emily Bahr at ¶ 1 and attached letter.)

Enclosed with the offer letter was a document entitled "Conditions of Employment Agreement." (Doc. No. 1-2, Agreement beginning at 26.) The agreement included a number of restrictive covenants in favor of TCP relating to the treatment of trade secrets and confidential information, TCP's inventions, the return of company materials in the event of termination, and the enforcement of non-solicitation and non-compete provisions following termination. The agreement, however, did not contain any other conditions of employment, and specifically did not address compensation, other than to indicate that plaintiff's entitlement to employment and any compensation was conditioned upon her accepting the terms of the agreement. The agreement also contained a choice of law provision that provided, in part:

> This agreement shall be governed by and construed in accordance with the internal laws of the State of Ohio without regard to its conflict of laws principles and any controversy or claim arising out of or relating to this Agreement shall be settled and/or adjudicated in the city in which the principal executive offices of the Employer are located.

(Agreement at 28.)

Plaintiff signed the agreement at her home in Minnesota, but neglected to bring it with her when she traveled to Ohio to take part in orientation at TCP's

headquarters. When she arrived at TCP's Ohio office, a duplicate original of the agreement was produced and she signed the agreement there. (Bahr Decl. at ¶ 5.)

In addition to the orientation session, plaintiff participated in some training sessions, sales meetings, and performance recognition programs in Ohio. However, she never discharged her sales duties in Ohio. (Bahr Decl. at ¶¶ 5, 9; Bahr Supp. Decl. at ¶ 2.) Instead, all of her sales-related duties were performed within her assigned territory of Minnesota, North Dakota, and South Dakota. Additionally, plaintiff used her Minnesota residence as her "base of operations," performing most of her administrative duties from her home. (Bahr Decl. at ¶¶ 4, 7.) In all, more than half of her time spent in the role as a district sales manager was spent in Minnesota. (*Id*. at ¶ 7.)

In July 2011, TCP announced a bonus plan, by which TCP employees were eligible to earn up to 200% of their base salary, provided that certain objectives were achieved. The bonus plan paid a percentage of salary based on "year over year" sales, and such payments were within TCP's discretion.[1] The plan was developed exclusively by TCP through employees in its Ohio office and was communicated to its sales representatives, including plaintiff, via email. (Doc. No. 1-2, Bonus Plan at 29; Joint Stip. at ¶ 15.) The bonus plan did not contain a choice of law provision, and did not make reference to any other agreement. TCP represents, and plaintiff does not dispute, that in February 2012, TCP paid Bahr a bonus of 75% of her salary, thereby resulting in a bonus payment of $34,229 (Doc. No. 20 at 151.)

---

[1] Specifically, the bonus plan provided: "Management reserves the right to amend, change or cancel the Bonus Plan at its discretion. It also reserves the right to reduce, modify or withhold awards based upon individual performance or management modification." (Doc. No. 1-2, Bonus Plan at 29.) Appended to the bonus plan was a grid setting forth the bonus targets and their payouts. (*Id*. at 30.)

4

In her complaint, plaintiff alleges that she achieved "year-over-year" sales growth of 113% in her territory for 2011, and that, as a result, she was entitled to a bonus of 200% of her base salary, or $85,945. (Compl. at ¶¶ 8-10.) Subtracting the $34,229 payment she received from TCP, Bahr alleges that she is still owed $51,716 in "wages" under the bonus plan. (*Id*. at ¶ 16.) In addition to her statutory claims under Minnesota and Ohio law, plaintiff brings claims for breach of a bilateral and/or unilateral contract, promissory estoppel, and unjust enrichment. She seeks an award "in an amount in excess of . . . $25,000.00," liquidated damages under Ohio Rev. Code § 4113.15(B), statutory damages and attorney's fees under Minn. Stat. §§ 181.03 and 181.171, interest, and costs. (*Id*. at 14-15.)

## II.    STANDARD OF REVIEW

A federal district court may exercise diversity jurisdiction over civil actions between citizens of different states "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs . . . ." 28 U.S.C § 1332(a). "The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *St. Paul Mercury Indem. Co. v. Red Cab Co*., 303 U.S. 283, 288, 58 S. Ct. 586, 82 L. Ed. 845 (1938) (footnotes omitted).

"The test for whether the jurisdictional amount has been met considers whether the plaintiff can succeed on the merits in only a very superficial way*." Kovacs v. Chesley*, 406 F.3d 393, 396 (6th Cir. 2005).  It does not matter that valid defenses may exist that would prevent such a recovery. *St. Paul Mercury Indem. Co*., 303 U.S. at 289. "It must appear to a legal certainty that the claim is really for less than the jurisdictional

5

amount to justify dismissal." *Id.* "[W]here . . . state law at least arguably permits the type of damages claimed, the amount in controversy requirement will be satisfied even if it is unlikely that the plaintiff can recover an amount exceeding the jurisdictional requirement." *Kovacs*, 406 F.3d at 397 (citing *Worthams v. Atlanta Life Ins. Co.*, 533 F.2d 994, 997 (6th Cir. 1976)).

## III.      DISCUSSION

Plaintiff finds herself in an awkward position. While she brought this action in state court and desired to remain there, she now argues that the amount in controversy is sufficiently large to satisfy federal diversity jurisdiction. This posture is necessitated by the fact that plaintiff believes that Minnesota law should govern her state law contract claims.[2] Defendant's position is equally unusual. Notwithstanding the fact that it removed this case to federal court upon the argument that plaintiff's claim under the Minnesota statute met the jurisdictional amount in controversy, it now argues against a finding of federal jurisdiction and a finding that Minnesota law applies. It is against this backdrop that the Court embarks upon its choice of law analysis.

### A.      *The Parties' Choice of Law*

It is well settled that a federal court sitting in diversity applies the choice of law rules of its forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487,

---

[2] Ordinarily, a court must classify the causes of action raised in a complaint as either contractual or tortious before the choice of law question can be answered because "different choice-of-law rules apply depending on whether the cause of action sounds in *contract* or in *tort*." *Ohayon v. Safeco Ins. Co*, 91 Ohio St. 3d 474, 476, 747 N.E.2d 206 (2001) (comparing and collecting cases) (emphasis in original). At this time, the Court is not called upon to determine the law that will govern plaintiff's tort claims. The only question before the Court is whether any of plaintiff's contract claims implicate an amount in controversy sufficient to support federal diversity jurisdiction. *See Everett v. Verizon Wireless, Inc.*, 460 F.3d 818, 822 (6th Cir. 2006) ("To satisfy the amount-in-controversy requirement at least one [of] plaintiff's claim[s] must independently meet the amount-in-controversy specification.")

496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941); *Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 738 (6th Cir. 1999). The Ohio Supreme Court has adopted the Restatement (Second) of Conflict of Laws to govern choice of law decisions. *See Tele-Save Merch. Co. v. Consumers Distrib. Co., Ltd.*, 814 F.2d 1120, 1122 (6th Cir. 1987) (quoting *Schulke Radio Prods., Ltd. v. Midwestern Broad. Co.*, 6 Ohio St. 3d 436, 438-39, 453 N. E.2d 683 (1983)). Under § 187(2) of the Restatement (Second) of Conflict of Laws, the law of the state chosen by the parties to a contract generally will be enforced, unless "[t]he chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or unless the "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue." *Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 739 (6th Cir. 1999) (quoting Restatement (Second) of Conflict of Laws § 187(2)); *see Schulke Radio Prods.*, 6 Ohio St. 3d at 438 (citing Restatement (Second) of Conflict of Laws § 187); *Ohayon v. Safeco Ins. Co.*, 91 Ohio St. 3d 474, 486, 747 N.E.2d 206 (2001).

The Court does not invoke § 187's deference to the parties' choice of law unless it is "satisfied that the parties have actually made an express choice of law regarding the issue before the court." *Ohayon*, 91 Ohio St. 3d at 486 (citing Restatement (Second) of Conflict of Laws § 187 cmt. a (1971)). "It does not suffice to demonstrate that the parties, if they had thought about the matter, would have wished to have the law of a particular state applied." Restatement (Second) of Conflict of Laws § 187 cmt. a.

Defendant argues that the parties have selected Ohio law to govern their contractual rights, by virtue of the choice of law provision in the aforementioned contract

7

styled "Conditions of Employment Agreement." According to TCP, the agreement constitutes an employment contract that governs all aspects of the employment relationship between Bahr and TCP, including the payment of any bonuses. The Court disagrees.

In *Pollock v. Viewpoint Corp.*, No. 05-71649, 2006 WL 1084083 (E.D. Mich. Jan. 18, 2006), the plaintiff entered into a similar agreement with his employer that governed the treatment of company inventions, copyrights, and trade secrets. The choice of law provision stated that "*[t]his Agreement* shall be construed to be in accordance with, and governed by, the laws of the State of New York." *Id.* at *3 (emphasis in original). In rejecting the argument that the agreement's choice of law provision governed plaintiff's action to recover commissions, the court found that the agreement encompassed "only matters relating to intellectual property and proprietary information, and cannot be viewed as reaching or governing issues beyond the scope of its subject matter." *Id.* In so ruling, the court underscored the fact that the agreement in question did not "even address the subject of commissions, much less purport to govern the parties' respective rights and obligations regarding the earning and payment of commissions." *Id.* (noting that the court "knows of no authority . . . that would dictate that the parties' choice of law as to one specific aspect of their contractual relationship should control all other aspects of their relationship, despite the absence of any indication that the parties intended this result").

Like the agreement in *Pollock*, the agreement here was limited in scope, as it only addressed certain discrete issues relating to plaintiff's employment—such as intellectual and proprietary property—and did not even mention the payment of any

8

bonuses. As for the choice of law provision, while the parties could have indicated that Ohio law applied to all aspects of the employment relationship, they chose to limit their choice of Ohio law to "[t]his agreement." (Agreement at 28.)

In fact, the agreement specifically contemplates that the parties may enter into *other* agreements in the future, providing further support for the conclusion that the agreement in question was not intended to cover all matters relating to the employment relationship. (*Id.* at 27 ["You understand and agree that your agreement to and compliance with the terms and conditions set forth herein, *or in any other agreement concerning your employment with the Employer*, shall neither obligate the Employer to continue your employment for any specific term nor entitle you to any compensation in excess of the compensation you may receive for your regular duties as and while an employee of the Employer."], emphasis added.) Because the agreement did not address the very issue that is at the heart of this litigation—the payment of bonuses—the Court cannot find that the agreement's choice of law provision applies to the present dispute.

### B.  Minnesota Law Applies to the Contract Dispute

Where, as here, the parties have not made an effective choice of law, the Court must apply the law of the state with the "most significant relationship to the transaction and the parties . . . ." Restatement (Second) of Conflict of Laws § 188 (1971); *see Int'l Ins. Co. v. Stonewall Ins. Co*., 86 F.3d 601, 604 (6th Cir. 1996); *Ohayon*, 91 Ohio St. 3d at 477-78. The contacts the Court must consider to determine which state has the most significant relationship include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation

9

and place of business of the parties." Restatement (Second) of Conflict of Laws § 188(2). The contacts are to be evaluated "according to their relative importance with respect to the particular issue." *Id*.

The bonus plan constitutes a unilateral contract. Both Ohio and Minnesota law recognize the validity of unilateral contracts, including those involving promises to pay bonuses.[3] *See Harwood v. Avaya Corp*., No. C2-05-828, 2007 WL 1574116, at *6 (S.D. Ohio May 25, 2007) ("Ohio courts long ago recognized that an employee bonus plan by which the employer offers to pay a bonus based upon the company's annual net profit gives rise to a contractual obligation on the part of the employer."); *McKelvey v. Spitzer Motor Center, Inc*., 46 Ohio App. 3d 75, 77 (1988) (same); *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626 (Minn. 1983) (recognizing the propriety of unilateral contracts in the employment context); *Hartung v. Billmeier*, 243 Minn. 148, 66 N.W.2d 784, 789-90 (1954) (recognizing a unilateral promise to pay a bonus as a supplement to any existing employment agreement).

Under Restatement (Second) of Conflict of Laws § 188, the place of contracting "is the place where occurred the last act necessary . . . to give the contract binding effect . . . ." Restatement (Second) of Conflict of Laws § 188 cmt. e. A unilateral offer by an employer to pay a bonus is not enforceable when made, but the employee can accept the offer, and thereby bind the employer, by continuing to serve as requested. 2 Corbin, Contracts § 6.2 (rev. ed. 1995). "Indeed, although the bonus is not fully earned

---

[3] While defendant argues that the bonus plan at issue in this case is not enforceable under Minnesota law due to its discretionary nature, the argument is irrelevant to the present jurisdictional analysis. The Court leaves the enforceability of the bonus plan for another day.

until the service has continued for the full time, after a substantial part of the service has been rendered the offer of the bonus cannot be withdrawn without a breach of contract." *Id.*

Given the fact that the bonus plan did not become enforceable until Bahr began to apply her services toward satisfying the target goals, the place where the last act necessary to give effect to the plan was one of the three states where plaintiff performed her work as a sales manager: Minnesota, North Dakota, or South Dakota. As between Minnesota and Ohio, this first factor favors Minnesota.[4]

The second factor—the place of negotiation—is inapplicable to the present dispute because TCP did not negotiate the terms with Bahr, or any other employee. Instead, the bonus plan was developed by TCP management at its Ohio headquarters. To the extent that Ohio has an interest in the enforcement of unilateral contracts developed in Ohio, this factor, however slight, weighs in favor of applying Ohio law.

The fourth factor—the location of the subject matter—offers little or no basis for choosing between Minnesota and Ohio as the bonus was located in Ohio and plaintiff's services were divided between Minnesota, North Dakota, and South Dakota.[5] Likewise, the fifth factor—the domicile or residence of the parties—is inconclusive,

---

[4] The parties focused their respective analyses on the contacts associated with the contracting of the written agreement plaintiff executed immediately after she was hired, with much discussion relating to when and where the contract was ultimately executed. This misses the mark, as plaintiff's claims in this litigation are tied to the bonus plan, not the agreement dealing with proprietary information.

[5] If anything, this factor weighs in favor of Minnesota law. While TCP argues that the subject matter of contract was the bonus, courts that have applied the § 188 analysis to service contracts have concluded that the subject matter of such a contract is the service to be provided. *See, e.g., Gramercy Mills v. Wolens*, 63 F.3d 569, 572 (7th Cir. 1995)*; Diesel Service Co. v. AMBAC Int'l Corp.*, 961 F.2d 635, 641 (7th Cir. 1992); *Ingram v. Rencor Controls, Inc.*, 256 F. Supp. 2d 12, 19 (D. Maine 2003); *Standard Register Co. v. Cleaver*, 30 F. Supp. 2d 1084, 1092 (N.D. Ind. 1998).

given that plaintiff is a resident of Minnesota and TCP is a Delaware corporation with its principal place of business in Ohio.

This leaves the third factor—the place of performance. "The state where performance is to occur under a contract has an obvious interest in the nature of the performance and in the party who is to perform." Restatement (Second) of Conflict of Laws § 188 cmt. e. *See Schulke Radio Prods*., 6 Ohio St. 3d at 438 ("Generally, Ohio follows the rule that where a conflict of law issue arises in a case involving a contract, the law of the state where the contract is to be performed governs."). In fact, the contract "which will usually be of greatest importance is the place, . . . where under the provisions of the agreement the agent is to act, or principally to act, in the principal's behalf." *See* Restatement (Second) of Conflict of Laws § 291 cmt. f (1971) (dealing with the principal/agent relationship).

In *Ingram v. Rencor Controls, Inc*., 256 F. Supp. 2d 12 (D. Maine 2003), the plaintiff sued his former employer to recover a bonus. While the majority of the § 188 factors were split evenly between applying Maine or New York law to the dispute, the court found the place of performance to be "dispositive." Noting that the plaintiff had been hired to cover the "Maine territory," which included Maine, Vermont, New Hampshire, and part of Massachusetts, with the majority of the work being done in Maine, the court concluded that, as between Maine and New York, Maine had a more significant relationship to the contractual dispute. *Id*. at 18. *See, e.g., Gramercy Mills v. Wolens*, 63 F.3d 569, 573 (7th Cir. 1995) (contract action by sales representative to recover commissions properly construed under Illinois law where performance was predominately in Illinois, even though some orders were solicited outside of Illinois).

12

Here, the bonus plan was based on "year over year" sales, and it was understood at the time the bonus plan was announced that plaintiff's sales efforts were split between Minnesota, North Dakota, and South Dakota, with a majority of her work actually performed in Minnesota. None of the sales that would have gone toward plaintiff's target goals under the bonus plan were in Ohio. There can be no doubt that the fourth factor weighs heavily in favor of Minnesota.

Because Minnesota is the place of contracting and performance of this service-based contract, the Court finds that Minnesota has the most significant relationship to this contractual dispute.[6] Therefore, under Restatement (Second) of Conflict of Laws § 188(2), the law of the state of Minnesota is the appropriate choice of law for plaintiff's contract claims.[7] In light of the fact that Minn. Stat. §§ 181.03 and 181.171 allows for a recovery of double damages and attorney's fees, the Court is

---

[6] An analysis under Restatement (Second) of Conflict of Laws § 196 (1971), which applies to contracts for the rendition of services, would lead to the same conclusion. In *Farris v. ITT Cannon, Div. of ITT Corp.*, 834 F. Supp. 1260 (D. Colo. 1993), the plaintiff, a former sales representative of a California corporation sued its former employer for breach of contract. The court rejected the former employer's argument that California law should control, and applying § 196 found that the law of the state of Washington governed where the employee, although traveling some outside of Washington, performed the majority of his agreed services as a sales representative for the California corporation in Washington. *Id.* at 1267. While § 196 may not apply to contracts where performance can take place in multiple states, *see* Restatement (Second) of Conflict of Laws § 196 cmt. a (§196 unlikely to aid in determining choice of law for "a traveling salesman in two or more states"), a finding that Minnesota law governs the present bonus dispute supports the rationale of § 196 that "[t]he rendition of the services is the principal objective of the contract, and the place where the services, or a major portion of the services, are to be rendered will naturally loom large in the minds of the parties." *Id.* at cmt. c.

[7] Section 188(1) provides that an application of a state's laws must also satisfy the principles of the Restatement (Second) of Conflict of Laws § 6, and the selection of Minnesota law clearly advances the goals enumerated in § 6. "Choosing the law of the place where the majority of the services are to be rendered 'furthers the choice-of-law values of certainty, predictability and uniformity of result and, since the place where the contract requires that the services, or a major portion of the services, are to be rendered will be readily ascertainable, of ease in the determination of the applicable law.'" *Ingram*, 256 F. Supp. 2d at 19 (quoting Restatement (Second) of Conflict of Laws § 6 cmt. c.)

satisfied that the amount in controversy exceeds $75,000.

                         **IT IS SO ORDERED**.

Dated: December 2, 2013

                                       **HONORABLE SARA LIOI**
                                       **UNITED STATES DISTRICT JUDGE**