# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| EMILY J. BAHR, | ) | CASE NO.  5:13CV1057 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | |
| | ) | |
| TECHNICAL CONSUMER | ) | |
| PRODUCTS, INC., | ) | |
| | ) | |
| DEFENDANT. | ) | |

In this breach of contract action, plaintiff Emily Bahr ("Bahr" or "plaintiff") seeks to recover a partially unpaid bonus allegedly due from her former employer, defendant Technical Consumer Products, Inc. ("TCP" or "defendant"). Defendant has moved for summary judgment in its favor on all of plaintiff's claims (Doc. No. 43). Plaintiff opposes the motion (Doc. No. 53), and defendant has filed a reply (Doc. No. 59). Plaintiff has filed a cross-motion for summary judgment (Doc. No. 40), seeking judgment as a matter of law on her breach of unilateral contract claim and her failure to remit wages claim under Minnesota statutory law, Counts Two and Three, respectively, of the complaint. (*See* Complaint, Doc. No. 1-2.) Defendant opposes this dispositive motion (Doc. No. 54), and plaintiff has replied (Doc. No. 58). Also before the Court are the following motions: (1) plaintiff's motion for leave to amend her complaint (Doc. No. 38); and (2) defendant's motion to strike plaintiff's summary judgment filings (Doc. No. 49). Both of these motions are opposed (Doc. No. 50 [defendant's opposition to

plaintiff's motion to amend]; Doc. No. 51 [plaintiff's opposition to defendant's motion to strike]).

## I. BACKGROUND

### A. *Plaintiff's Employment with TCP*

TCP is an Ohio-based company that manufactures and distributes energy-efficient lighting products. (Doc. No. 1-2 at ¶ 2; Deposition of Michael Masino, Doc. No. 46 at 1485.) In 2010, Bahr, a Minnesota resident, responded to TCP's internet advertisement for a district sales manager. (Doc. No. 1-2 at ¶ 1; Declaration of Emily Bahr, Doc. No. 21-1 at ¶ 2; Email Response, Doc. No. 45-2 at 1318.) After a favorable screening interview with human relations for TCP, Bahr was interviewed on two occasions by members of TCP management. (Joint Stipulations, Doc. No. 18 at ¶¶ 3, 5; Doc. No. 21-1 at ¶ 2; Deposition of Emily Bahr, Doc. No. 45 at 1196.) On June 9, 2010, TCP extended Bahr an offer of employment as a district sales manager for the territory consisting of Minnesota, North Dakota, and South Dakota, at an annual base salary of $42,500. (Doc. No. 45 at 1208-09; Job Offer, Doc. No. 45-4 at 1333.) On June 17, 2010, Bahr accepted TCP's offer and assumed her job duties as a district sales manager. (Letter of Acceptance, Doc. No. 45-7 at 1343.) Neither the offer letter, nor Bahr acceptance letter referenced any type of a bonus or bonus plan.

In fact, it is undisputed that, at the time Bahr was interviewing with TCP, the company did not have a bonus plan. After TCP had extended its offer of employment to Bahr, but before she accepted it, Bahr sent an email to TCP's Regional Sales Manager, Matthew Fejedelem, requesting information on the availability of possible bonuses. (Doc. No. 45 at 1209, 1214; Email Exchange, Doc. No. 45-5 beginning at 1334.) Fejedelem

2

responded to Bahr's inquiry by explaining that the company was contemplating a bonus plan, and that "there are no finalized details of the incentive plan at this point . . . but I would figure this will be finalized shortly . . . my guess is there will be quarterly and yearly incentives in place for the 2nd half of 2010 forward[.]" (Doc. No. 45-5 at 1335.) Fejedelem followed up with some additional information in an email on June 16, 2010. It was Fejedelem's understanding that the plan would be based on year over year sales growth and year over year gross margins. He gave a "[r]ough example" of how a bonus would be paid assuming a hypothetical set of sales figures. He also observed that the program "is in the final stages of being implemented" and that he was "excited" by the prospect of the program because "Mike [Masino, Senior Vice President,] wants us all to be rewarded for the hard work we put in." (*Id.* at 1337.) In a separate email, Fejedelem forwarded to Bahr a response he had received from Masino, in which Masino imparted some additional information about the anticipated plan, noting that "here is a high level overview of the Sales Bonus plan WHICH HAS NOT BEEN OFFICIALLY APPROVED. This is an overview and is certainly subject to change." (Doc. No. 45-6 at 1339, capitalization in original.) According to Masino's email, the bonus plan under consideration would permit an individual to earn up to 50% of his or her salary. (*Id.* at 1339.)

According to Bahr, this was the first and only time that she discussed the prospect of a bonus plan with anyone from TCP (Doc. No. 45 at 1217, 1224-25), and this email exchange with Fejedelem represented the totality of her pre-employment conversations with TCP about earning bonuses as a district sales manager. (*Id.* at 1224-25.) Notwithstanding the fact that she knew that the bonus plan had yet to be approved,

Bahr insists that she relied on the representations in the emails regarding the anticipated bonus plan in accepting TCP's offer of employment. (*Id*. at 1219; Second Supplemental Declaration of Emily Bahr, Doc. No. 41-1 at ¶ 1.)

  B.  *The Bonus Plan*

    In July 2011, TCP announced a bonus plan, which was communicated to its district sales managers, including Bahr, via email. (Doc. No. 1-2 at ¶ 6; Doc. No. 18 at ¶ 15.) The document, entitled "C&I Bonus Plan Terms & Conditions," provided, in part:

> You can earn up to <u>200% of Base Salary</u> if certain objectives are achieved. All payouts will be paid no later than 45 days following the bonus period end. Unless noted otherwise, all bonus plans are on an annualized basis and based on a calendar year. All computations and allocations will be established by the Company and be arbitrated solely by the Company.

(Bonus Plan, Doc. No. 1-2 at 29, emphasis in original.)

    Significant to the present litigation, the bonus plan contained a section entitled "Plan Subject to Change" that provided:

> Management reserves the right to amend, change, or cancel the Bonus Plan at its discretion. It also reserves the right to reduce, modify or withhold awards based upon individual performance or management modification.

(*Id*.) The bonus plan also included a section bearing the heading "Windfall and Shortfall Situations" that addressed unexpected sales situations and how they would impact the bonus plan. Specifically, that section provided:

> Any windfall or shortfall situations that have a significant impact on sales or other measurement criteria will be dealt with on an individual basis by management. Adjustments to these measures can be made throughout the year at the discretion of the Company, and upon written communication to the participant. The discretion of management is final

(*Id*.) Attached to the bonus plan was a payout schedule that charted possible bonus awards based on varying levels of sales growth. (*Id*. at 30.)

        C.     *The 2011 Bonus Payout*

        At the time of the unveiling of the new bonus plan, Bahr's territory sales were already "tracking" in line to earn her a maximum bonus of 200% of her base annual compensation. (Doc. No. 41-1 at ¶ 3.) According to Bahr, she "received assurances from [Director of Operations Ryan Miller] that he fully expected the company to honor the *full amount* of its bonus commitment to [her] if [she] continued to 'track' sales growth and gross margins in [her] territory at the rates [she] had reported on [her] sales for the first nine months of [2011]." (*Id*., emphasis in original). It is undisputed that sales volumes in Bahr's territory did "track" at a rate that would have translated into a 200% payout under the bonus plan. (Deposition of Matthew Fejedelem, Doc. No. 41-4 at 757 [2011 sales growth for Bahr's territory was 113%]; Deposition of Mike Masino, Doc. No. 46 at 1616.) Based upon her 2011 sales results, Bahr anticipated receiving a bonus of $85,945, or 200% of her base salary.[1] (Doc. No. 1-2 at ¶ 10.)

        On December 21, 2011, TCP provided its sales force with a portion of their anticipated bonus plan payout for the holidays. (Doc. No. 45 at 1254.) The payment was accompanied by a letter from Valerie Campbell, TCP's Chief Financial Officer. (Doc. No. 45-11 at 1448.) In the letter, Campbell thanked TCP's employees for their hard work in 2011. However, she also cautioned them that "[a]s you know, all year I've said that "the ability for us to pay bonuses will not be determined until the books are

---

[1] For the fall 2011 calendar year, TCP increased Bahr's base compensation to $42,972.50. (Doc. No. 1-2 at ¶ 4.)

completely closed for the year which would be sometime in January. While I would like for nothing better than to give bonuses before the holidays, there are simply many reasons why I felt we should wait until the books are closed." (*Id*.) In her deposition, Campbell testified that the payment in December 2011 was an "advance on the bonus paid [in 2012], if [TCP] determined bonuses could be paid [in 2012]." (Deposition of Valerie Campbell, Doc. No. 47 at 1863.)

On February 3, 2012, TCP provided Bahr with an email explaining that her 2012 payout under the bonus plan would be $34,229, which represented 75% of her base salary. (February 3, 2012 email from Miller to Bahr, Doc. No. 45-14 at 1461.) Miller explained that "[b]onus payouts across the company were primarily based on performance, but also constrained by overall company profitability in 2011. The resulting executive decisions were not subjective, but rather based on total dollars available to fund bonus payouts." (*Id*.) Anticipating a larger payout, Bahr sent an email to Fejedelem, Masino, and Miller, stating that she was disappointed that she did not receive the 200% of base salary bonus to which she believed she was entitled. (Doc. No. 45 at 1261-62; February 6, 2012 Email from Bahr to Miller, Doc. No. 45-15 at 1462.) In his response, Miller advised Bahr that "the company's overall 2011 financial profitability overrode performance-based calculations. Your specific payout was more a function of available dollars than a specific grid calculation." (Doc. No. 45-15 at 1462; *see also* Doc. No. 45 at 1259.) Bahr responded to Miller, indicating that she found her bonus to be "shocking and disappointing." (February 9, 2012 Email from Bahr to Miller, Doc. No. 45-16 at 1463.)

In her deposition, Campbell testified that the company-wide reduction in bonuses paid in 2012 for the 2011 fiscal year was the result of the company's need to

honor its fixed charge covenant with its lender, and that the company did not know how much money would be left over for bonus payouts until TCP closed its books on the fiscal year. (Doc. No. 47 at 1860-65.) She explained that a fixed charge covenant, whereby a borrower keeps a certain amount of cash on hand, ensures that the borrower "can meet certain ratios and cover its fixed operating expenses, that its cash flow can meet the fixed operating expenses." (*Id*. at 1866.) According to Campbell, breaching its fixed charge covenant with the bank could have resulted in TCP defaulting on its line of credit. (*Id*. at 1876.)

Bahr continued working for TCP for another eight months after learning of her 2011 bonus payout. In October 2012, Bahr resigned her position to accept a position with Cooper Wiring Devices. (Doc. No. 45 at 1278-79.) She testified that she accepted the position with Cooper Wiring Devices because of the opportunity for career "advancement," the promise of better pay, and because she was disappointed with her 2011 bonus from TCP. (*Id*. at 1278-79, 1285-87.) She also indicated that she wanted to work for an employer who was "more honest in their negotiations with [her]." (*Id*. at 1278; *see also* 1286.)

D.    *The Present Litigation*

On April 4, 2013, Bahr filed suit against TCP in state court to recover the $51,716 in unpaid bonus she maintains she was shorted. (Doc. No. 1-2 at ¶ 16.) Plaintiff's complaint raised the following claims: breach of express bilateral contract (Count One), breach of express unilateral contract (Count Two), failure to remit wages under Minn. Stat. § 181 *et seq*. (Count Three), failure to remit wages under Ohio Rev.

7

Code § 4113.15 (Count Four), promissory estoppel (Count Five), and unjust enrichment (Count Six).

TCP removed the action to this Court. At the initial Case Management Conference, the Court *sua sponte* raised the issue of its jurisdiction to hear this matter, and directed the parties to brief the issue. The parties agreed that if Minnesota law did not apply to Bahr's claims, diversity jurisdiction would be lacking because the alleged unpaid bonus amount of $51,716 would not exceed the $75,000 amount in controversy threshold. While Minnesota's prompt pay state provides for double damages and attorney's fees, its Ohio counterpart does not. *Compare* Minn. Stat. § 181.171(3) *with* Ohio Rev. Code § 4113.15.

On December 2, 2013, the Court issued an opinion and order finding that Minnesota law applied to the present dispute; therefore, the Court had jurisdiction to entertain plaintiff's claims. (Opinion and Order, Doc. No. 37 at 298.) In arriving at this conclusion, the Court applied the Sixth Circuit's test for diversity jurisdiction, which considers whether "'the plaintiff can succeed on the merits in only a very superficial way.'" (Doc. No. 37 at 290 [quoting *Kovacs v. Chesley*, 406 F.3d 393, 396 (6th Cir. 2005)].) In accordance with this test, the Court did not consider any of TCP's defenses, including its assertion that the bonus was not enforceable under Minnesota law due to its discretionary nature, leaving "the enforceability of the bonus plan for another day." (*Id.* at 295, n.3.)

## II.   DEFENDANT'S MOTION TO STRIKE

On December 16, 2013, the deadline set by the Court for filing dispositive motions, Bahr moved for summary judgment. Later that same day, she filed a three-page

8

"supplement" that included three paragraphs under the heading of "Summary of Argument" that Bahr claimed were inadvertently omitted from her summary judgment motion by a new software program adopted by her attorney's office (Doc. No. 42). The following day (December 17, 2013) brought a new filing, an "errata correcting memorandum" that purported to make certain corrections to typographical errors contained in Bahr's dispositive motion (Doc. No. 48). Plaintiff did not seek leave to file either document.

TCP moves, pursuant to L.R. 7.1, to strike these supplemental filings as nonconforming documents. It charges that Bahr has used these documents to exceed the twenty (20) page limit imposed by the Court's local rules and to circumvent the Court's December 16, 2013 deadline for filing dispositive motions. (Doc. No. 49.) Additionally, TCP claims that Bahr gratuitously inserted additional arguments in these filings to covertly "bolster" her summary judgment motion. (*Id*. at 2061-62.)

Bahr responds by underscoring the fact that even when the "Summary of Argument" section is added into the number of pages of text previously offered in support of summary judgment, the total number of pages does not exceed the twenty (20) page limit imposed by L.R. 7.1(f). To prove this point, plaintiff has attached to her response brief yet another summary judgment submission, this one purporting to incorporate the previously missing "Summary of Argument" section to show that the sum total of her filings do not exceed the page limit. (Doc. No. 51-2.) Of course, this *fourth* summary judgment submission does not include the additional arguments that TCP complains were offered after the dispositive motion deadline.

It is well settled that federal district courts have the inherent power to manage their own dockets. *Link v. Wabash R.R. Co*., 370 U.S. 626, 630, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962); *Anthony v. BTR Auto. Sealing Sys., Inc*., 339 F.3d 506, 516 (6th Cir. 2003). This Court sets dates and deadlines in its cases to ensure the orderly and efficient administration of justice. The efforts of parties and counsel to skirt around the Court's deadlines only serve to delay cases and divert the Court's attention away from addressing each case on the merits. Additionally, piecemeal motion practice makes for a confusing record. To the extent that Bahr's tardy submissions add new arguments—without seeking leave of court—they could properly be disregarded. However, given the fact that these supplemental arguments do not change the Court's analysis, and TCP has not demonstrated prejudice from the belated submissions, defendant's motion to strike is denied.

### III.   SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R.

Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863

11

F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

### IV.        ANALYSIS OF TCP'S BONUS PLAN AND PLAINTIFF'S CLAIMS

Both summary judgment motions require the Court to determine whether the bonus plan at issue constituted an enforceable contract, and whether there was a breach. In her motion, plaintiff appears to suggest that the Court already made the first half of that determination when it ruled on jurisdiction. (Doc. No. 40 at 352; *see also* Doc. No. 53 at 2110.) The Court need spend little time on this argument other than to reiterate that the Court's ruling on jurisdiction was clearly not a decision on the merits, and the Court specifically reserved "for another day" the question of whether the bonus plan was an enforceable unilateral agreement. (Doc. No. 37 at 295, n.3.) That day, however, has now arrived.

#### A.        *Breach of Express Unilateral Agreement Claim*

Bahr argues that the 2011 bonus plan was a unilateral contract that became binding upon TCP when Bahr completed her performance under the agreement by meeting her sales objectives before TCP unilaterally decided to modify the terms by reducing the amount of the payout. TCP posits that because the bonus plan clearly reserved TCP's right to modify, reduce, or eliminate any bonus payout under the plan at

its sole discretion, there can be no clear and definite offer on which Bahr could have reasonably relied.

Pursuant to Minnesota law, a unilateral contract is formed when there is a definite offer, communicated to and accepted by the offeree, for valuable consideration.[2] *Alpine Glass, Inc. v. Illinois Farmers Ins. Co*., 643 F.3d 659, 666 (8th Cir. 2011) (citing *Martens v. Minn. Mining & Mfg. Co*., 616 N.W.2d 732, 742 (Minn. 2000)). The "offer must be sufficiently definite to form the basis of a contract." *Grenier v. Air Express Int'l Corp.*, 132 F. Supp. 2d 1198, 1201 (D. Minn. 2001) (cites omitted); *see Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626 (Minn. 1983). "If an offer is so indefinite as to make it impossible for a court to decide what it means and to fix exactly the legal liabilities of parties, its acceptance cannot result in an enforceable contract." *Grenier*, 132 F. Supp. 2d at 1201 (cite omitted); *see, e.g., Ruud v. Great Plains Supply, Inc*., 526 N.W.2d 369, 372 (Minn. 1995) (holding that statements made by employer to employee were too indefinite to form an offer for a unilateral contract).

"Whether a proposal is meant to be an offer for a unilateral contract is determined by the outward manifestations of the parties, not by their subjective intentions." *Pine River*, 333 N.W.2d at 626 (cite omitted); *see Grenier*, 132 F. Supp. 2d at 1200 (same). The determination of whether an enforceable unilateral contract has been formed is a question of law to be answered by the court. *Chambers v. Travelers Cos., Inc*., 764 F. Supp. 2d 1071, 1087 (D. Minn. 2011) (citing *Martens*, 616 N.W.2d at 740);

---

[2] "The differences between a unilateral contract and a bilateral contract, as those terms are now commonly used, lie both in the operative acts of the parties and also in the legal relations created thereby. A unilateral contract consists of a promise or group of promises made by one of the contracting parties only, usually by assent to by the other . . . A bilateral contract consists of mutual promises, made in exchange for each other by each of the two contracting parties." 1-1 Corbin on Contracts § 1.23 (2013).

*see Hunt v. IBM Mid Am. Employees Fed. Credit Union*, 384 N.W.2d 853, 856 (Minn. 1986).

In support of its argument that the bonus plan was too indefinite to supply the foundation for an enforceable agreement, TCP directs the Court to two Minnesota cases involving employee incentive plans. *Grenier* involved a bonus plan whereby the employer expressly reserved complete discretion to determine what business qualified for the incentive bonus. *Grenier*, 132 F. Supp. 2d at 1199. The court found that the fact that the employer retained the right to determine what type of performance would be rewarded under the plan prevented the plan "from constituting an offer for a binding unilateral contract as a matter of law." *Id*. at 1201.

In *Chambers*, the employer maintained a bonus policy that stated that bonuses were "discretionary awards used to reward superior performance." 764 F. Supp. 2d at 1080. The court found this policy too indefinite to form a binding unilateral contract, noting that "[t]he fact that discretion is left with Travelers to determine whether its at will employees receive bonuses precludes a finding that a unilateral contract between Chambers and Travelers was formed concerning Chambers' 2007 bonus, because there [was] no clear offer, and thus it [was] not possible for the Court to fix the legal liabilities of the parties." *Id*. at 1087 (citing *Grenier*, 132 F. Supp. 2d at 1201). In reaching this conclusion, the court underscored the fact that Chambers admitted that she had received documents from Travelers that indicated that the bonus was discretionary. *Id*.

Plaintiff argues that *Chambers* and *Grenier* are distinguishable on the facts because TCP's bonus plan is very definite as to what conduct entitles an employee to a

14

bonus and how that bonus will be calculated. On this narrow point, the Court agrees. While the plan does not identify what "objectives" will be rewarded, it does include a schedule that shows the payouts available for each level of sales growth. Still, the bonus plan—like the incentive plans in *Chambers* and *Grenier*—specifically reserved for TCP the discretion to adjust the plan as it deemed appropriate at its sole determination.

"Cases from [various] jurisdictions generally reinforce the conclusion that contract formation does not occur when an employer retains absolute discretion or a unilateral right to modify or cancel employee commission." *Schwarzkopf v. Int'l Bus. Mach., Inc.*, No. C 08-2715 JF (HRL), 2010 WL 1929625, at *8 (N.D. Cal. May 12, 2010) (collecting cases finding no enforceable unilateral agreement); *see Geras v. Int'l Bus. Mach. Corp.*, 638 F.3d 1311, 1316 (10th Cir. 2011) ("Nothing in the incentive letter suggested any circumstances in which the payment of incentives could be considered mandatory[.]"); *Jensen v. Int'l Bus. Mach. Corp.*, 454 F.3d 382, 388 (4th Cir. 2006) (announcement of discretionary bonus plan "did not invite a bargain or manifest a willingness to enter into a bargain") (quote omitted); *see also In re Klein-Swanson*, 488 B.R. 628, 633 (B.A.P. 8th Cir. 2013) ("Under Minnesota law, no offer has been made by an employer and employee has no contract for funds under an employer's award program, when the employer maintains the right to decide in its sole discretion whether it will award such funds to the employee.")

"In a few cases, courts have held that there is an enforceable contract notwithstanding the employer's discretion to modify or alter a commission arrangement but nevertheless have rejected the plaintiff's breach of contract allegation." *Schwarzkopf*, 2010 WL 1929625, at *8 (collecting cases finding a contract but no breach). "These cases

15

suggest that retention of unilateral discretion on the part of one party is not determinative of contract formation, but that discretion properly exercised under the agreement will not constitute breach." *Id.*; *see also Hart v. Sprint Commc'n Co.*, 872 F. Supp. 848, 857 (D. Kan. 1994) ("When a contract grants or reserves discretion to one party, the other party cannot legitimately maintain a reasonable expectation that such discretion or judgment will not be exercised.")

For example, in *Bley v. ClickShip Direct, Inc.*, No. 01-611 MJD/SRN, 2001 WL 1640093, at *1 (D. Minn. Dec. 12, 2001), the employer's incentive plan "provided for specific criteria to measure the accomplishment of each employee toward stated goals." The plan also contained "a reservation clause that vested discretion" with the employer "to amend or terminate" the plan. *Id.* at *2. While the court found that the incentive plan contained definite terms, it determined that the agreement had not been breached because the plan reserved to the employer the right to amend or terminate the plan. Relying on Eighth Circuit case law, the court observed that "when a contract term leaves a decision to the discretion of one party, that decision is virtually unreviewable, unless that party is charged with fraud, bad faith or grossly mistaken exercise of judgment." *Id.* at 2 (citing *Vigoro Indus., Inc. v. Crisp*, 82 F.3d 785, 791 (8th Cir. 1996)).

In the present case, Bahr has not alleged, or come forward with any evidence, that TCP acted with fraud or bad faith when it exercised its discretion to reduce the amount of the bonus payouts for the 2011 fiscal year. While Bahr clearly did not agree with the decision, she admits that the plan was discretionary, and concedes that the

16

company's profitability may have been the impetus for the modification.[3] (Doc. No. 45 at 1260-61.) Moreover, the Court is without discretion to impliedly impose a duty of good faith on TCP, as "Minnesota does not recognize an implied duty of good faith and fair dealing in employment contracts." *Brozo v. Oracle Corp*., 324 F.3d 661, 668 (8th Cir. 2003) (citing, among authorities, *Hunt*, 384 N.W.2d at 858).

Relying on *Kvidera v. Rotation Eng'g & Mfg. Co*., 705 N.W.2d 416 (Minn. Ct. App. 2005), Bahr argues that even if TCP's initial obligation to pay on the bonus plan was discretionary, that duty became mandatory when Bahr completed her performance before TCP took steps to modify or rescind the terms. (Doc. No. 40 at 352.) However, in *Kvidera*, the employee had an employment contract that specifically set forth the terms of his bonus arrangement—terms that did not leave the payment of the bonus to the discretion of his employer. In fact, the court acknowledged that it was not confronted with a claim under a "gratuitous bonus subject solely to the employer's discretion."[4] *Id*. at 423. The court in *Chambers* rejected a similar argument under *Kvidera*, noting that the employee's reliance on *Kvidera* was "misplaced however, because, unlike the plaintiff in *Kvidera*, Chambers did not have an explicit contract with

---

[3] In briefing on summary judgment, plaintiff also appears to offer an alternative reason for the reduction in bonus payouts: TCP wanted to improve its "bottom line" in anticipation of an initial public offering ("IPO") "to attract outside investment into the company[.]" (Doc. No. 40 at 348, n.27.) The record cites plaintiff highlights do not support this conclusion, and, in fact, Campbell testified that the fixed charge coverage covenant was the "*only reason*" for reducing the amount of the bonuses. (Doc. No. 47 at 1913, emphasis added.) Nonetheless, the discretion TCP reserved in the bonus plan would have allowed for a reduction in bonuses to improve the company's public profile as well.

[4] Plaintiff analogies TCP's conduct to that of "a parent troubled by his or her distraught daughter's loss of a pet kitty" who hangs "posters all around town offering '$100' for finding the kitty, only to claim after someone brings the kitty back home that what the parent really was willing to pay" was a sum far less than that original offered. (Doc. No. 40 at 353.) Of course, the analogy would only work if the reward poster also stated that the pet owner reserved the right to alter or modify the reward. In such a case, the finder would return the kitten aware that the reward was not a sure thing.

[his employer] which stated that she would receive a bonus if she met certain conditions. She was an at-will employee who simply was eligible to receive a bonus at Travelers' discretion." *Chambers*, 764 F. Supp. 2d at 1088; *see Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 837, n.4 (Minn. 2012) (noting that in "*Kvidera*, the court of appeals distinguished between a 'mandatory' bonus given pursuant to an employee's achievement of *contractually-specified* criteria—which would support a claim under the Payment of Wages Act—and a 'discretionary' bonus that has no such *contractual* basis and therefore would not support a claim under the Payment of Wages Act.")

Bahr also complains that TCP breached the bonus plan because it did not give her prior notice of its intention to modify the bonus payouts. In support, she turns to the "Windfall and Shortfall" section of the plan that provides that adjustments based on unexpected shifts in sales will be made "upon written communication to the participant." (Doc. No. 1-2 at 29.) Bahr maintains that the notice provision of this section applied to, and modified, all other provisions in the plan. "Contract language is given its plain and ordinary meaning, read in context of the instrument as a whole." *Baker v. Best Buy Stores, LP*, 812 N.W.2d 177, 180 (Minn. Ct. App. 2012) (citing *Brookfield Trade Ctr. v. Cnty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998)); *see also Kauffman Stewart, Inc. v. Weinbrenner Shoe Co., Inc.*, 589 N.W.2d 499, 502 (Minn. Ct. App. 1999) ("Words or phrases found in a contract should not be interpreted out of context[.]") Even a cursory reading of the bonus plan demonstrates that the notice requirement is limited to the situation involving windfalls and shortfalls—which the parties agree is not present here—and cannot be read as modifying the entire plan. The Court will not expand the effect of a contract provision by forcing an alternative construction when the provision is clear and

18

unambiguous. *See Am. Nat'l Bank of Minn. v. Hous. & Redev. Auth. for City of Brainerd*, 773 N.W.2d 333, 337 (Minn. Ct. App. 2009).

Ultimately, Bahr cannot get past the discretionary nature of TCP's bonus plan. Even assurances she may have received from Miller and others that the TCP would pay bonuses in accordance with the payout schedule cannot serve to eliminate the discretion TCP reserved for itself when it issued the bonus plan. *See Schwarzkopf*, 2010 WL 1929625, at *8 (encouraging statements from plaintiff's managers that he "should be paid in full" could not expand the terms of the bonus agreement). Whether the discretion reserved by TCP destroys the formation of any contract or simply precludes the finding of a breach, it is clear that Bahr's claim for breach of express unilateral agreement fails as a matter of law.[5]

### B. *Breach of Express Bilateral Agreement Claim*

Bahr claims that TCP's conduct also constituted a breach of an express bilateral agreement. (Doc. No. 1-2 at ¶ 20.) Even if there were any evidence of the exchange of mutual promises necessary for a bilateral agreement, *see Sylvestre v. State*, 214 N.W.2d 658, 664-65 (Minn. 1973) (quote omitted), a claim of breach of an express bilateral agreement would fail for the same reasons plaintiff's breach of a unilateral contract claim failed. For example, in *Brozo*, the parties entered into an "arms-length

---

[5] Even if she had an enforceable right at the time of the payout, the fact that she remained in TCP's employ for eight months—aware that TCP had unilaterally altered the bonus plan—would defeat any possible surviving claim. *See Whisman v. Ford Motor Co.,* 157 F. App'x 792, 801 (6th Cir. 2005) ("Because the plaintiffs did not quit, but continued to work for [their employer], even after [their employer] altered its overtime and annual incentive policies, the modification to the plaintiffs' employment agreements was supported by consideration. Consequently, the plaintiffs have no basis on which to sue for breach of contract."); *Friedenfeld v. Winthrop Res. Corp.*, C5-02-1606, C4-02-1659, 2003 WL 1908112, at *5 (Minn. Ct. App. Apr. 22, 2003) (because the plaintiff continued to work for nine months after his employer stopped paying commissions, his at-will employment contract was amended to exclude the entitlement to any commissions).

19

agreement . . . regarding the terms and conditions by which Brozo's incentive compensation would be determined." 324 F.3d at 666. Pursuant to the terms of the agreement, the employer reserved the right to change the terms at any time, which it elected to do. Noting that the bilateral agreement "unambiguously gave [the employer] the discretion to reduce Brozo's commission[,]" the Eighth Circuit ruled that the district court erred in denying the employer's motion for judgment as a matter of law. *Id*. at 668. Plaintiff's claim for breach of a bilateral contract is dismissed.

C. *Failure to Remit Wages Claim under Minn. Stat. § 181 et seq.*

Plaintiff's complaint provides that by failing to pay the full amount of the bonus set forth in the bonus plan, TCP violated Minnesota's prompt payment statutes. (Doc. No. 1-2 at ¶ 37.) While these statutes provide a mechanism by which an employee may recover unpaid wages, they do not create any substantive rights. *See Caldas*, 820 N.W.2d at 837 ("[S]ection 181.13(a) is a timing statute, mandating not *what* an employer must pay a discharged employee, but *when* an employer must pay a discharged employee.") (emphasis in original) (citing *Lee v. Fresenius Med. Care, Inc*., 741 N.W.2d 117, 125-26 (Minn. 2007)). Rather, the wages that are due and owing to the employee are defined by the employment contract. *See id*., ("'wages that an employee has actually earned are defined by the employment contract between the employer and the employee and cannot be determined through a claim brought under section 181.13(a)'") (quoting *Lee*, 741 N.W.2d at 127-28). Because Bahr has no legal right to the additional  bonus she

seeks, her failure to remit wages claim under Minnesota law fails. TCP is entitled to summary judgment on this claim.[6]

        D.       *Promissory Estoppel Claim*

In Count Five, plaintiff alleges that she relied to her detriment on representations made in the bonus plan as to bonus payouts, and that TCP is, therefore, bound by the representations made therein. (Doc. No. 1-2 at ¶¶ 43-47.) Under Minnesota law, "'[p]romissory estoppel has three elements: (1) a clear and definite promise; (2) the promisor intended to induce reliance and such reliance occurred; and (3) the promise must be enforced to prevent injustice.'" *Myrlie v. Countrywide Bank*, 775 F. Supp. 2d 1100, 1106 (D. Minn. 2011) (quoting *Greuling v. Wells Fargo Home Mtg., Inc*., 690 N.W.2d 757, 761 (Minn. Ct. App. 2005)); *Friedenfeld v. Winthrop Res. Corp*., C5-02-1606, C4-02-1659, 2003 WL 1908112, at *6 (Minn. Ct. App. Apr. 22, 2003) ("A claim for promissory estoppel requires a clear and definite promise.") (cite omitted). Because the bonus plan vested sole discretion in TCP to alter, modify or eliminate any bonus award, there was no clear and definite promise made to Bahr. *See, e.g., Friedenfeld*, 2003 WL 1908112, at *6 (absent a specific promise to pay a bonus, no claim for promissory estoppel can stand). Additionally, because TCP merely exercised the right reserved to it under the bonus plan, justice does not require a contrary result. Accordingly, Bahr's promissory estoppel claim fails as a matter of law.

---

[6] For the same reasons, Bahr's failure to remit wages under Ohio's Prompt Pay Act, Ohio Rev. Code § 4113.15, would fail if that statute were in force. Such a claim would be subject to dismissal for the additional reason that the word "wage" as used in § 4113.15 does not include "commissions, which are not guaranteed pay or reimbursement for expenses." *See Haines & Co., Inc. v. Stewart*, Case No. 2000CA00138, 2001 WL 166465, at *3 (Ohio Ct. App. Feb. 5, 2001).

E.      *Unjust Enrichment Claim*

Plaintiff also claims that TCP has been unjustly enriched by failing to remit to her the full amount of her bonus. (Doc. No. 1-2 at ¶ 49.) "Unjust enrichment is an equitable doctrine that allows a plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable." *Caldas*, 820 N.W.2d at 838. The Minnesota Supreme Court has explained that, "[u]njust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term unjustly could mean illegally or unlawfully." *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996) (quote omitted). Thus, to prevail on such a claim, a plaintiff must demonstrate that unjust enrichment occurred through conduct that was "illegal or unlawful." *Caldas*, 820 N.W.2d at 838 (citing *First Nat'l Bank v. Ramier*, 311 N.W.2d 504 (Minn. 1981)). In the present case, Bahr's unjust enrichment claim is predicated upon the theory that TCP improved its financial health at the expense of its employees. However unpopular TCP's unilateral decision to reduce bonus payouts to its employees was to its workforce, it was not unlawful or illegal. It cannot, therefore, support a claim for unjust enrichment. This claim is also subject to summary dismissal.

V.      **PLAINTIFF'S MOTION TO AMEND**

On the last day of discovery, months after the deadline for amending pleadings and within six days of the dispositive motion deadline, plaintiff moved to amend her complaint (Doc. No. 38). The proposed amendments do not add any new claims. Instead, the amendments are designed to: (1) correct typographical errors; (2) conform the pleaded allegations to the evidence in discovery; and (3) "modify, clarify,

supplement, or amplify" the complaint allegations. (*Id*. at 303-4.) Indeed, a review of the red-lined version of the proposed amended complaint, appended to plaintiff's motion, reveals that the proposed amendments either add supporting facts or argument to her existing claims. (*See* Doc. No. 38-1.)

Generally, a party may amend its pleadings once as a matter of course, but in all other situations it may amend a pleading only with the opposing party's written consent or leave of court. Fed. R. Civ. P. 15(a). Leave under Rule 15 is to be "freely give[n] when justice so requires." Once the court's deadline for amending pleadings has passed, however, "'a plaintiff must first show good cause under Rule 16(b) [of the Federal Rules of Civil Procedure] for failure earlier to seek leave to amend' and the district court must evaluate prejudice to the nonmoving party 'before a court will [even] consider whether amendment is proper under Rule 15(a).'" *Commerce Benefits Group, Inc. v. McKesson Corp.*, 326 F. App'x 369, 376 (6th Cir. 2009) (quoting *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003)). Additionally, Rule 15 permits amendments during and after trial. Specifically, Rule 15(b)(1) provides:

> If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

Fed. R. Civ. P. 15(b)(1).

Plaintiff has failed to demonstrate good cause for her delay in seeking leave to amend under Rule 15(a). Plaintiff knew as early as October 30, 2013 that she

was planning to amend.[7] Yet she waited 41 days, apparently to acquire additional facts through discovery. Further, the Court finds that the proposed amendments "would not affect the determination of plaintiff's claims as analyzed above. Therefore, Fed. R. Civ. P. 15(a), which calls for leave to be granted 'when justice so requires' does not indicate that leave should be granted in this instance." *Case v. Goodyear Tire & Rubber Co*., No. C87-1445A, 1989 WL 418792, at *6 (N.D. Ohio June 13, 1989) (rejecting motion under Rule 15(a) to amend complaint after close of discovery to add additional factual allegations). Thus, even if the Court were to permit the amendment, it would not change the result on summary judgment.

Though not stated as such, plaintiff's motion also appears to seek leave to amend under Rule 15(b) to conform the complaint allegations to the evidence uncovered during discovery. (*See* Doc. No. 38 at 304.) However, Rule 15(b) is inapplicable here because that section contemplates amendments to conform to the evidence *offered at trial*. *See Gregg v. Ohio Dep't of Youth Servs*., 661 F. Supp. 2d 842, 848 (S.D. Ohio 2009); *see, e.g., Wuliger v. Canella Response Television, Inc*., No. 3:05CV854, 2007 WL 2156291, at *1 (N.D. Ohio July 25, 2007) (denying motion to amend after close of discovery, but noting that an amendment could be sought at trial to conform pleadings to the evidence). Plaintiff's motion to amend is DENIED.

---

[7] During Bahr's deposition on October 30, 2013, plaintiff's counsel interrupted defense counsel's examination of Bahr to announce that his client was planning to amend her complaint. (Doc. No. 45 at 1182.)

**VI.**     **CONCLUSION**

For all of the foregoing reasons, plaintiff's motion for partial summary judgment and her motion to amend her complaint are DENIED. Defendant's motion to strike is DENIED, and defendant's motion for summary judgment is GRANTED IN ITS ENTIRETY. This case is closed.

**IT IS SO ORDERED**.

Dated: March 17, 2014

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**